# EXHIBIT A

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------X
THOMAS CARABALLO,

                                    PLAINTIFF,

         -against-              Case No.:
                                21-CV-00285
                                (ARR)(VMS)


THE CITY OF NEW YORK, DETECTIVE KAISER
SURRIGA, TAX REG #946303, DETECTIVE WAYNE
COSTELLO, TAX REG #950244, DETECTIVE ROBERT
DIFALCO, TAX REG #952684, AND OTHER
UNIDENTIFIED  NEW YORK CITY POLICE OFFICERS,
JOHN AND JANE DOES,
                                    DEFENDANTS.
-----------------------------------------------X

                        DATE: MAY 9, 2022
                        TIME: 10:27 a.m.


     DEPOSITION of the Plaintiff, THOMAS CARABALLO,
taken by the Defendants, pursuant to Stipulation and to
the Federal Rules of Civil Procedure, held at the
above-mentioned date and time, before Jennifer Bloom, a
Notary Public of the State of New York.



T. CARABALLO

Page 44

held.)

Q.   So to the best of your knowledge has anyone else ever driven that vehicle?

A.   Before I bought it or after?

Q.   I'll rephrase it.  To the best of your knowledge prior to January 23rd, 2019, after you bought the vehicle has anyone else besides you ever driven it?

A.   No.

Q.   To the best of your knowledge has your daughter ever driven your vehicle?

A.   No.

Q.   On January 23rd, 2019, did your car have tinted windows?

A.   Yes.

Q.   Which windows were tinted?

A.   I believe the front and the back.

Q.   When you say the front and the back, which windows exactly?

A.   The front passenger side and the -- the front. I mean, the back passenger side and the back driver's side.

Q.   Were the two front windows also tinted?

A.   No.

Q.   Do you know what percentage tint were on those windows?



T. CARABALLO

Page 46

A.   No.

Q.   For what purpose did you drive that car on January 22nd, 2019?

A.   Pleasure and work.

Q.   And when you returned where did you park?

A.   In front of my house, in front of my garage.

Q.   And what time did you park your car on January 22nd, 2019?

A.   I don't recall.

Q.   From the time you parked on January 22nd, 2019 until 5:00 p.m. on January 23rd, 2019, had you driven your car?

A.   I don't remember.

Q.   When you parked your car on January 22nd, 2019, did you park in front of a fire hydrant?

A.   No.

Q.   At approximately 6:00 p.m. on January 23rd, 2019, why were you inside your car?

A.   Say that again.  Repeat the question.

Q.   I'll rephrase.  At approximately 6:00 p.m. on January 23rd, 2019, were you inside your car about to drive to this Italian food place?

A.   Yes.

Q.   How long were you sitting in your car for approximately?

A.   Before I left my house or in front of the place?

MR. PHEMISTER:  Can I help?  I think, so this happened not in front of his house, but at the deli.

THE WITNESS:  Right.

MR. KHAIRY:  Okay.

MR. PHEMISTER:  And I just want to make sure, you asked about a fire hydrant, but I think you said on the 22nd instead of the 23rd.

MR. KHAIRY:  Got it.

Q.   So did there ever come a time where you drove to the Italian food place --

A.   Yes.

Q.   -- on January 23rd, 2019?

A.   Yes.

Q.   Approximately how long of a drive was that?

A.   How long of a drive?  Thirty seconds, forty seconds.

Q.   When you arrived at the Italian food place where did you park your car?

A.   In front of it.

Q.   Was there a fire hydrant where you parked your vehicle?

A.   Yes.

T. CARABALLO

Page 48

Q. Did you see that fire hydrant prior to parking your vehicle?

A. Yes.

Q. Why were you parked in front of the fire hydrant?

A. I was waiting for the sandwich.

Q. Approximately how long were you parked in front of that fire hydrant for?

A. Forty minutes.

Q. During that forty-minute time period what were you doing inside your car?

A. Waiting for the sandwich and eating the sandwich.

Q. At any point while you were sitting inside your vehicle did someone approach your car and start talking to you?

A. Yes.

Q. Do you know who those people were?

A. Not at first.

Q. When you say not at first, what do you mean?

A. I didn't know who it was at first.

Q. Okay. Did you ever come to learn who those people were?

A. Yes.

Q. Who were they?



T. CARABALLO

Page 54

telling me you're parked in the driveway a little bit, on the curb a little bit.  And I explained to him that I was eating my sandwich and drinking a coffee.  Then he kept asking me questions.  And I said, who are you that I got to ask, answer to.  And that's when he started walking towards me and said I'm police officer.  And that's when I asked him how do I know you're a cop.  And then he pulled out the badge.

Q.    What did you do after he pulled out his badge?

A.    I was still talking to him.

Q.    Okay.  At any point did he ask you for license and registration and insurance?

A.    Yes.

Q.    Okay.  Did you provide him with that?

A.    No.

Q.    Why not?

A.    I don't feel like I didn't have to provide it.

Q.    Why do you feel that way?

A.    Because I wasn't driving.

Q.    When you were in front of the deli eating your sandwich during that forty-minute time period, were the keys in the ignition?

A.    I believe so.

Q.    And was the car on during that forty-minute time period?



T. CARABALLO

Page 57

A.   I said to -- 'cause there's one time I was going to give my ID to the first officer.  After I questioned him I just finally was, gave in, and I was giving him ID in my wallet.  I just happened to look to the left side, the driver's side, and I see this other cop with the gun to the window.

Q.   And what did you do when you saw that?

A.   I put my hands up more and I said, listen, my ID's in the glove compartment.  I ain't reaching for nothing, I'm scared, get a supervisor and I'll get out of the car.

Q.   How did the officers respond?

A.   He says no -- he just said just open the door and I was like no.

Q.   Why didn't you want to open the door?

A.   I was scared.  I was scared to reach for anything, not even the door.

Q.   Did you believe that these two individuals were in fact police officers?

A.   Not at first.

Q.   Why not?

A.   They were in plain clothes.

Q.   Did there ever come a time where you did believe that they were police officers?

A.   Yes.



T. CARABALLO

Page 64

Q.   Do you remember what race he was?

A.   Yes.

Q.   What race?

A.   Caucasian.

Q.   Did you see this fourth individual with his badge out?

A.   I don't recall.

Q.   At any point did you see this fourth individual with his badge out?

A.   I don't recall.

Q.   Prior to this second set of officers responding, how long had you been interacting with the first set of officers for?

A.   Fifteen minutes or so.

Q.   Okay.  At any point during that fifteen-minute interaction did you provide the officers with your license, registration or insurance?

A.   No.

Q.   Now, you mentioned the officers broke your window.  Did that happen before or after the second set of officers arrived?

A.   After.

Q.   At any point did any of the officers warn you they were going to break your window?

A.   No.

T. CARABALLO

Page 65

Q.   At any point did any of the officers warn you that if you did not step out they would break the window?

A.   No.

Q.   At any point did any of the officers say anything to you right before they broke the window?

A.   Say what?

Q.   I'll rephrase it.  What were the officers saying to you, if anything, right before they broke the window?

A.   Well, the second set of officers said, are you going to open the door.

Q.   And how did you respond?

A.   I said, are you a supervisor.

Q.   And how did they respond to that?

A.   He said, no.

Q.   Did you at any point open the door?

A.   No.

Q.   Why not?

A.   'Cause he's not a supervisor.  I requested a supervisor several times.

Q.   Why did you want a supervisor?

A.   For the safety of my life.

Q.   Now, we keep talking about the broken window. Which window did the officers break?

T. CARABALLO

Page 66

A. Passenger side.

Q. Passenger front or back?

A. Front.

Q. Do you know which of the officers broke the window?

A. The Asian one.

Q. Do you know how he broke the window?

A. He pulled out like a modern-day billy club.

Q. Describe how he broke the window?

A. He was banging it with the billy club.

Q. Approximately how many times did he hit the window?

A. Well, both of them, a few times.

Q. When you say both of them, are you saying that there were multiple officers that broke the window?

A. I'm saying they were banging on both sides. The driver's side window and the passenger side window.

Q. Which of the officers were banging on the window on the driver's side?

A. The second set of officer.

Q. Was it both of the officers or just one of them?

A. One.

Q. Describe how he was banging on the window?

A. Striking it with the billy club.

Page 67

Q.   So is it fair to say that there was an officer on the front passenger side banging on the window as well as another officer banging on the window on the driver's side?

A.   Correct.

Q.   Okay.  At any point did either of these windows break?

A.   Yes.

Q.   Which window?

A.   The passenger side front window.

Q.   Did the driver's side front window break?

A.   No.

Q.   Approximately how many times did the Asian officer strike the front passenger side window before it broke?

A.   Three to five times.

Q.   When the window broke, did the glass shatter?

A.   Yes.

Q.   Where did the glass go?

A.   Everywhere.

Q.   Did the glass get on you?

A.   Yes.

Q.   What happened as soon as that officer broke the passenger side window?

A.   He unlocked all the doors with the button.

T. CARABALLO

Page 68

Q.    Did he at any point enter the vehicle to do that or did he do that by reaching in --

A.    Reaching in.

Q.    -- or something else?

A.    Reaching in.

Q.    What happened as soon as this officer on the passenger side unlocked all the car doors?

A.    The officers on the driver's side opened that door, the driver's side door.

Q.    Describe how they opened that driver's side door?

A.    Open with the handle.

Q.    The handle on the outside; is that right?

A.    Correct.

Q.    What happened as soon as they were able to open the door?

A.    They grabbed me and threw me on the floor. And started beating me.

Q.    As soon as the officers open the door, at any point did you try and close it?

A.    No.

Q.    At any point after the officers opened the door did it close?

A.    No.

Q.    Describe how you were taken out of the

Page 69

vehicle?

A.    Violently.

Q.    I'll rephrase that.  Were you taken out through the door or the window of the driver's side front window?

A.    The door.

Q.    So you were not taken out through the window; is that right?  I'm sorry, can you repeat that?

A.    No.

Q.    Sorry, you just keep fading in and out.  So just make sure you're speaking up.

MR. PHEMISTER:  If two people are talking at the same time only one will come through so wait until the other person is completely finished.

A.    No.

Q.    How many officers did it take for you to get out of the vehicle?

A.    They used two officers to drag me out of the car.

Q.    Were you resisting the officers when they reached in to take you out of the vehicle?

A.    No.

Q.    Where were the officers' hands when they grabbed you inside of the vehicle?

A.    One on my arm to pull me out.



T. CARABALLO

Page 79

friendly conversation?

A.    Yes.

Q.    But you didn't engage him in any conversation --

A.    No.

Q.    -- is that right?

A.    Correct.

Q.    While you were at the precinct did any of the officers process your arrest?

A.    Yes.

Q.    Do you know which of the officers processed your arrest?

A.    I'm not sure.  I know Johnson was there, the supervisor was there.

Q.    At any point while you were in the precinct did you complain of any injuries?

A.    Yes.

Q.    What injuries did you complain of?

A.    My elbow, my head.  I think my knee and my back.  I don't know if I felt the pain on my knee or back yet to be honest.  My adrenaline was so high.

Q.    Who did you make these complaints to?

A.    Johnson.

Q.    As a result of these complaints did Detective Johnson do anything?



**Page 82**

A. No.

Q. I'm sorry, Mr. Caraballo, just please wait till I'm done with my question.

Other than the injury to your eye, the abrasion to your forehead and the abrasion to your elbow, did you make any other complaints to EMS while they were at the 104th Precinct?

A. No.

Q. While you were at the 104th Precinct did you complain of any other injuries that we haven't discussed to the officers?

A. I don't recall that.

Q. Okay. Where did you go after the 104th Precinct?

A. Central booking.

Q. Approximately how long did you spend at Queens Central Booking?

A. Twenty-four hours.

Q. Did you make any complaints of any injuries while you were at Queens Central Booking?

A. No.

Q. Where were you transported to after Queens Central Booking?

A. I was released on my own recognizance.

Q. Prior to being released on your own

Page 83

recognizance did you appear before a judge?

A.   Yes.

Q.   When you appeared before this judge was this for arraignment?

A.   Yes.

Q.   To the best of your knowledge what charges were you arraigned on?

A.   Standing in a fire hydrant, drugs, drug packaging, resisting arrest.  And then it was -- I forget how they put it, stop them from doing their job, government official thing I forgot.  That was at that time.

Q.   That last charge you're referring to are you referring to obstruction of governmental administration?

A.   Right.

Q.   Now, you mentioned that you were also charged with drug crimes.

Do you know which drug crimes you were charged with?

A.   They said possession of drugs I believe.

Q.   Do you know what kind of drugs they were alleging you had possessed?

A.   I believe it was crack cocaine.

Q.   Were you in fact possessing crack or cocaine on January 23rd, 2019?