UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

THOMAS CARABALLO,

               *Plaintiff*,

    -against-

CITY OF NEW YORK, DETECTIVE KAISER SURRIGA,
DETECTIVE WAYNE COSTELLO, and DETECTIVE
ROBERT DIFALCO,

               *Defendants*.

21-CV-285 (ARR) (VMS)

**OPINION & ORDER**

ROSS, United States District Judge:

    Plaintiff, Thomas Caraballo, brings this action alleging that defendants the City of New York and Detectives Kaiser Surriga, Wayne Costello, and Robert DiFalco violated his constitutional rights when they arrested him for alleged traffic violations and other minor infractions. Defendants now move for summary judgment on the bulk of Mr. Caraballo's claims. For the reasons set forth below, I grant defendants' motion in part and deny it in part.

## BACKGROUND

    The following facts are derived from the parties' depositions, exhibits, memoranda, and respective Local Rule 56.1 Statements of Facts. Unless otherwise noted, the facts as recounted here are undisputed. All evidence is construed in the light most favorable to plaintiff as the non-moving party. *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

    This case arises out of Mr. Caraballo's arrest and prosecution following allegations that he committed multiple traffic violations, refused to comply with defendants' orders, and possessed illegal narcotics. Pl.'s Mem. Law in Opp'n Defs.' Mot. Summ. J. 6–7 ("Pl.'s Opp'n"), ECF No. 53. On January 23, 2019, Mr. Caraballo was sitting in the driver's seat of his vehicle, which was parked in front of a fire hydrant, when Detective Surriga approached the vehicle's front passenger-

side window and asked Mr. Caraballo for his license, insurance, and registration. *See* Decl. Jason Lesnevec in Supp. Pl.'s Opp'n to Defs.' Mot. Summ. J. ("Lesnevec Decl."), Ex. 2 ("Pl. Testimony") at 47:20–49:6, ECF No. 52-2; *id.*, Ex. 3 ("Detective Surriga Testimony") at 67:7–19, 68:22–69:1, ECF No. 52-3; *id.* Ex. 1, ECF No. 52-1 (photograph of plaintiff sitting in the driver's seat prior to his arrest); Pl.'s Opp'n 10 (explaining that Exhibit 1 shows plaintiff "through his driver's side window prior to his arrest"); Pl.'s 56.1 Responses to Defs.' 56.1 Statement of Undisputed Material Facts ¶¶ 1–2a, 4–4a ("Pl.'s 56.1 Responses"), ECF No. 51. The parties dispute whether Mr. Caraballo refused to provide his license, insurance, and registration upon Detective Surriga's request. Pl.'s 56.1 Responses ¶¶ 5–5a.[1] They also dispute whether, in addition to being parked in front of a fire hydrant, Mr. Caraballo's vehicle had front windows that were tinted beyond the legal limit. *Id.* ¶¶ 3–3a.[2]

Sometime after this initial interaction, Mr. Caraballo noticed the presence of a second officer—Detective Costello—standing at the driver's-side front window. Pl. Testimony at 55:7–25, 57:1–6; *see also* Detective Surriga Testimony at 68:18–21, 71:21–22 (testifying that Detective Costello approached the vehicle from the driver's side). After the officers requested documentation from Mr. Caraballo, they also requested that he open his car door. Pl.'s 56.1 Responses ¶¶ 6–6a; *see also* Pl. Testimony at 57:13; Detective Surriga Testimony at 72:21–25. It is clear from the record that Mr. Caraballo refused to open his vehicle's door, *see* Pl. Testimony at 57:13–14; Detective Surriga Testimony at 72:21–73:10; the parties dispute, however, for how long Mr. Caraballo maintained this refusal, Pl.'s 56.1 Responses ¶¶ 7–7a.[3]

After another set of officers, including Detective DiFalco, arrived on the scene, *see* Pl.

---

[1] For a discussion of whether this fact is genuinely disputed see *infra* Discussion I.B.

[2] For a discussion of whether this fact is genuinely disputed see *infra* Discussion II.B.2.

[3] For a discussion of whether this fact is genuinely disputed see *infra* Discussion V.B.

Testimony at 63:1–5; Detective Surriga Testimony at 72:19–20, defendants again requested that Mr. Caraballo open his car door, but he refused, Pl. Testimony at 65:11–21. While Mr. Caraballo was still inside his vehicle, Detective Surriga broke plaintiff's front passenger-side window and unlocked the vehicle's doors. Pl.'s 56.1 Responses ¶¶ 8–8a. Detectives Costello and DiFalco then forcibly removed Mr. Caraballo from his vehicle and arrested him; the parties dispute, however, whether defendants removed him through the rolled-down driver's window or through the open driver's door. *Id.* ¶¶ 9–10a.[4]

Defendants contend that while performing an inventory search of Mr. Caraballo's vehicle after his arrest, Detective Surriga recovered "rocks appearing to be crack cocaine," a razor blade "with what appeared to be cocaine residue," and drug paraphernalia, "including fifty-five rubber bands and a vacuum sealed bag." Defs.' Rule 56.1 Statement ¶ 11, ECF No. 48. Defendants also allege that Detective Surriga field tested the "rocks appearing to be crack cocaine," and that they tested positive for cocaine. *Id.* ¶ 12. Plaintiff disputes all facts related to the inventory search and the field test. Pl.'s 56.1 Responses ¶¶ 11–13a.[5]

Mr. Caraballo was charged with obstruction of governmental administration, resisting arrest, parking within fifteen feet of a fire hydrant, excessively tinted windows, and criminal possession of a controlled substance. *Id.* ¶¶ 13–13a. In May 2019, however, the possession and parking charges were dropped after a lab test of the rock substances recovered from plaintiff's vehicle yielded a negative result. *Id.* ¶¶ 15–15a;  Pl.'s Opp'n 7; Defs.' Mem. in Supp. Mot. Summ. J. 7 ("Defs.' Mem."), ECF No. 50.  The remaining charges were dropped in December 2020. Pl.'s 56.1 Responses ¶¶ 15–15a.

---

[4] For a discussion of whether this fact is genuinely disputed see *infra* Discussion V.B.

[5] For a discussion of whether these facts are genuinely disputed see *infra* Discussion II.B.3.

In January 2021, Mr. Caraballo filed a complaint against defendants making § 1983 claims of: (1) false arrest/imprisonment; (2) malicious prosecution; (3) malicious abuse of process; (4) denial of the right to a fair trial; (5) excessive use of force; and (6) failure to intervene. Compl. ¶¶ 43–92, ECF No. 1; *see* Pl.'s Opp'n 7.[6] Defendants move for summary judgment as to all of plaintiff's claims, excluding parts of plaintiff's excessive use of force and failure to intervene claims.[7] Defs.' Mem. 1.

## LEGAL STANDARD

### I.   Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quotation omitted); *see also* Fed. R. Civ. P. 56. A "material" fact is one that could "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine" dispute over a material fact exists if "the evidence is such that a reasonable jury could return a verdict for the

---

[6] To the extent that plaintiff asserts any additional claims via the complaint's first cause of action, *see* Compl. ¶¶ 40–43, he appears to have abandoned them. *See Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 257 (2d Cir. 2024).

[7] Mr. Caraballo alleges that after Detectives Costello and DiFalco removed him from his vehicle, the officers "battered" him with a club "all about his back area and the rear of his legs" while he was lying face down on the pavement. Compl. ¶ 22. He also alleges that Detective DiFalco placed a knee on the back of his neck while he was handcuffed, and that the officers, thereafter, violently "yanked" him around. *Id.* ¶¶ 23–24; *see also* Pl.'s Opp'n 6–7. According to Mr. Caraballo, this treatment caused him to suffer a knee injury requiring surgery and a back injury. Compl. ¶ 38. Finally, he alleges that Detective Surriga failed to intervene to stop the other defendants from beating him with batons. *Id.* ¶¶ 80–83. Defendants' motion for summary judgment covers neither: (1) the excessive use of force claims related to plaintiff's allegations that Detectives Costello and DiFalco used excessive force by battering him after removing him from the vehicle; nor (2) plaintiff's claim that Detective Surriga failed to intervene to stop the other officers from battering him. Defs.' Mem. 1. Accordingly, these claims survive.

nonmoving party." *Id.*

The moving party bears the burden of demonstrating that no genuine issues of material fact exist, *Marvel*, 310 F.3d at 286, and if the movant meets this burden, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation and emphasis omitted). Although the reviewing court must "examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant," *Marvel*, 310 F.3d at 286, "mere speculation or conjecture" or "conclusory allegations or denials" are insufficient to overcome a motion for summary judgment, *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (quotations omitted). Instead, to survive a motion for summary judgment the nonmovant "must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).

In considering a motion for summary judgment, it is not the role of the district court to "resolve disputed questions of fact." *Rupp v. Buffalo*, 91 F.4th 623, 634 (2d Cir. 2024) (quotation and emphasis omitted). Instead, the district court's role is isolated to determining "whether, as to any material issue, a genuine factual dispute exists." *Id.* (quotation and emphasis omitted). In fulfilling this role, the district court "is not to make credibility determinations or weigh the evidence"; these are the jury's functions. *Id.* Summary judgment is appropriate only where no such issue exists and "there can be but one reasonable conclusion as to the verdict." *Id.* (quoting *Anderson*, 477 U.S. at 250).

## DISCUSSION

Defendants move for summary judgment on all of plaintiff's false arrest/ false imprisonment, malicious prosecution, malicious abuse of process, and denial of the right to a fair

5

trial claims. Defs.' Mem. 1. Defendants move for summary judgment on part of plaintiff's excessive use of force and failure to intervene claims. *Id*. For the reasons below, I grant defendants' motion in part and deny it in part.

### I.   False Arrest/False Imprisonment

I grant defendants' motion for summary judgment on plaintiff's false arrest/false imprisonment claim.

### A.  Law

A § 1983 claim for false arrest under the Fourth Amendment is "substantially the same as a claim for false arrest under New York law," *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir. 1996), and federal courts generally look to state law to analyze such constitutional claims, *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004). The same is true for false imprisonment. *Kaplan v. Cnty. of Orange*, 528 F. Supp. 3d 141, 169 (S.D.N.Y. 2021). In New York, "the elements of a false arrest and false imprisonment claim" are the same. *Hernandez v. United States*, 939 F.3d 191, 199 (2d Cir. 2019). Accordingly, I will analyze plaintiff's false arrest and false imprisonment claims together.[8]

To state a claim for false arrest/false imprisonment under New York law, a plaintiff must show that: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement[,] and (4) the confinement was not otherwise privileged." *Hernandez*, 939 F.3d at 199 (quotation omitted). If the government has probable cause to arrest or confine, then an arrest is "privileged." *Id.* (quotation omitted). In a case involving multiple charges, it is irrelevant whether probable cause exists for each individual

---

[8] Although plaintiff's complaint asserts his false arrest and false imprisonment claims separately, Compl. ¶¶ 43–52, the parties brief these causes of action as a single claim, *see* Pl.'s Opp'n 9–12; Defs.' Mem. 4–9.

charge; instead, probable cause need only exist for the arrest. *Jaegly v. Couch*, 439 F.3d 149, 153–4 (2d Cir. 2006).

Probable cause exists "when 'the historical facts, viewed from the standpoint of an objectively reasonable police officer,' . . . provide knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Rupp*, 91 F.4th at 638–39 (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). This analysis must be conducted by "reference to the totality of the circumstances." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010). On a motion for summary judgment, a court can determine probable cause as a matter of law only "where there is no dispute as to what facts were relied on to demonstrate probable cause," *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 243 (2d Cir. 2020) (quotation omitted); "[q]uestions of historical fact regarding the officers' knowledge at the time of arrest" are reserved for the jury, *Dufort v. City of New York*, 874 F.3d 338, 348 (2d Cir. 2017).

A defendant may also be entitled to summary judgment on a false arrest/false imprisonment claim under the doctrine of qualified immunity. Qualified immunity "shields police officers acting in their official capacity from suits for damages unless their actions violate clearly established rights of which an objectively reasonable official would have known." *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (cleaned up). The issues on qualified immunity are: "(1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether the right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the officer to believe the conduct at issue was lawful." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154–55 (2d Cir. 2013) (quotations omitted). In the false arrest context, "qualified immunity protects an officer if he had arguable probable cause to arrest

the plaintiff." *Myers v. Patterson,* 819 F.3d 625, 632 (2d Cir. 2016) (quotations omitted). The Second Circuit has affirmed, however, that "'[a]rguable' probable cause should not be misunderstood to mean 'almost' probable cause." *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007). Instead, arguable probable cause exists, and an officer is entitled to qualified immunity "as a matter of law, only if 'the undisputed facts and all permissible inferences favorable to the plaintiff show . . . that officers of reasonable competence could disagree on whether the probable cause test was met.'" *Moroughan v. Cnty. of Suffolk*, 514 F. Supp. 3d 479, 541 (E.D.N.Y. 2021) (quoting *McClellan v. Smith*, 439 F.3d 137, 147–48 (2d Cir. 2006)) (emphasis omitted). Because defendants invoke the doctrine of qualified immunity, I review the merits of plaintiff's claim through this lens.

### B. Application

Defendants argue that Mr. Caraballo's false arrest/false imprisonment claims fail because the officers had at least arguable probable cause to arrest him for excessively tinted windows, obstruction of governmental administration, and possession of controlled substances. Defs.' Mem. 4–7. I will start with defendants' argument that they had probable cause to arrest Mr. Caraballo for obstruction of governmental administration.

Under New York law, a person is guilty of obstructing governmental administration when he: "intentionally obstructs, impairs[,] or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act." N.Y. Penal Law § 195.05. To meet the elements of this crime any "interference must be physical and must obstruct an official function authorized by law." *Dancy v. McGinley*, 843 F.3d 93, 111 (2d Cir. 2016) (cleaned up). The physical interference requirement has been

broadly construed and can be "minimal." *Basinki v. City of New York*, 706 Fed. App'x 693, 698 (2d Cir. 2017) (quoting *In re Daval L.*, 666 N.Y.S. 2d 1015, 1017 (1997)).

Defendants argue that they had probable cause to arrest Mr. Caraballo for obstruction of governmental administration because he: (1) refused to provide to Detective Surriga his identification, registration, and insurance information—a violation of Rule 4-12(a)(3) of the New York City Traffic Rules and Regulations ("NYC Traffic Rules")—and (2) refused to open his vehicle's door upon defendants' order, preventing them from taking him into custody. *See* Defs.' Mem. 6; Defs.' Reply in Supp. Mot. Summ. J. 4 ("Defs.' Reply"), ECF No. 54. Plaintiff, on the other hand, argues that failure to comply with police orders, by itself, does not create probable cause to arrest for obstruction of governmental administration and that plaintiff did not engage in any other form of unlawful obstruction. Pl.'s Opp'n 11.

Plaintiff is correct that in New York, failure to comply with these police orders, by itself, is not an independently unlawful act. *See Uzoukwu v. City of New York*, 805 F.3d 409, 416 (2d Cir. 2015) ("[U]nder New York law obstruction of governmental administration cannot rest upon refusal to provide identification."); *Jackson v. City of New York*, 939 F. Supp. 2d 219, 230 (E.D.N.Y. 2013) (noting the absence of any caselaw establishing that "refusal to exit a vehicle, without more, amounts to probable cause"). The cases that plaintiff cite, however, do not stand for the proposition that failure to follow a police order can *never* constitute probable cause to arrest someone. Instead, both cases recognize that failure to comply with a police order may provide probable cause for an arrest. *See Uzoukwu*, 805 F.3d at 416–17 (distinguishing a New York case in which the defendant was charged with an "independently unlawful act"); *Jackson*, 939 F. Supp. 2d at 230 (distinguishing cases where "the relevant unheeded police order was justified by a separate unlawful act"); *see also Dancy*, 843 F.3d at 112 ("[I]ndividuals have a right not to respond

[to a police request] *in the absence of* reasonable suspicion or probable cause.") (emphasis added).

Defendants argue that when Mr. Caraballo refused to open his vehicle's door, he was otherwise lawfully detained because he allegedly refused to provide his license, registration, and insurance information upon request—a violation of Rule 4-12(a)(3) of the NYC Traffic Rules. Defs.' Mem. 6; Defs.' Reply 4; *see* Pl.'s 56.1 Responses ¶ 5. Although under New York law Mr. Caraballo's alleged refusal to provide his documents cannot constitute an independently unlawful act for the purposes of the obstructing governmental administration charge, *see People v. Alston*, 805 N.Y.S.2d 258, 260–61 (Crim. Ct. 2005), it was reasonable for defendants to construe his refusal to open his car door as physical interference with governmental administration, *see Lennon v. Miller*, 66 F.3d 416, 424 (2d Cir. 1995); *see also McKenzie v. City of New York*, No. 17-CV-4899, 2019 WL 3288267, at *7 (S.D.N.Y. July 22, 2019) ("[Plaintiff's refusal] to abide by [defendant's] requests . . . to turn off his motor and exit his vehicle . . . . [gave the defendant] probable cause to arrest for obstruction of governmental administration."). Accordingly, if Mr. Caraballo was otherwise lawfully detained when he refused defendants' request to open his door, defendants had at least arguable probable cause to arrest him for obstructing governmental administration.

Whether Mr. Caraballo was otherwise lawfully detained turns on whether defendants had at least arguable probable cause to believe that Mr. Caraballo violated NYC Traffic Rule 4-12(a)(3). In New York, "violations of the New York City Traffic Rules are . . . arrestable offenses." *Frederick v. Boyd*, No. 13-CV-897 (EK), 2021 WL 2646326, at *7 (E.D.N.Y. June 28, 2021) ("*Frederick II*"); *see also Alston*, 805 N.Y.S.2d at 261 ("It is well settled in New York that although it is preferable to issue a summons for a traffic infraction rather than arresting the offender, when the suspect is unable or unwilling to provide identification . . . arrest is warranted."); N.Y. Vehicle

and Traffic Law § 155 ("VTL").[9] As a result, *if* Mr. Caraballo refused to provide his license, registration, and information, and *if* NYC Traffic Rule 4-12(a)(3) applies to him, defendants had at least arguable probable cause to arrest him for this violation, which in turn means that Mr. Caraballo was otherwise lawfully detained when he refused to open his door. Plaintiff disputes, however, defendants' assertion that Mr. Caraballo refused to provide his license, insurance, and registration upon Detective Surriga's request. Pl.'s 56.1 Responses ¶¶ 4–5a.

Plaintiff's attempted dispute is unavailing for two reasons. First, plaintiff's dispute—that he was not required to provide the requested information because he was not driving—is not responsive to defendants' assertion that he failed to provide the requested documentation; instead, it simply states the reason for plaintiff's refusal. *Id.* ¶ 5a. In fact, the portion of plaintiff's deposition testimony that he cites does not support the contention that he did not refuse to provide the requested documentation; rather it supports the opposite conclusion—that Mr. Caraballo refused to provide his license, registration, and identification upon request. Pl. Testimony at 54:11–15,

---

[9] I once again join several other courts in this circuit in expressing concern over full custodial arrests for non-criminal traffic violations. *See Gonzalez v. City of New York*, 14-CV-7721, 2017 WL 149985, at *2 (S.D.N.Y. Jan. 13, 2017) ("The constitutionality of subjecting someone who steps off the sidewalk and walks a few steps in the roadway to a full-blown custodial arrest appears dubious, but binding precedent dictates the outcome in this case."); *Glasgow v. Beary*, 2 F. Supp. 3d 419, 424 (E.D.N.Y. 2014) ("The constitutionality of a full custodial arrest based only on probable cause for a non-criminal traffic infraction is unclear and dubious."). Full custodial arrests carry significant consequences including that, "once arrested, an individual may be handcuffed, searched, and divested of property, kept in a jail cell for forty-eight hours without encountering a judicial officer, and forced to undergo a visual inspection of genitals, all without offending the Fourth Amendment." *Glasgow*, 2 F. Supp. 3d at 424. Additionally, evidence suggests that, in New York City, officers disproportionately enforce the traffic code against Black and Latinx individuals. *See* Jesse Barber, *Black, Latinx People were 90 Percent of Those Arrested in NYPD Traffic Stops*, New York Civil Liberties Union (March 24, 2023), https://www.nyclu.org/en/news/black-latinx-people-were-90-percent-those-arrested-nypd-traffic-stops ("Nevertheless, the New York State legislature has made clear that traffic infractions are arrestable offenses. Absent a legislative mandate" or Supreme Court decision "to the contrary, I am bound to find that defendant officers' arrest of plaintiff was proper." *Harris v. City of New York*, No. 20-CV-784 (ARR), 2022 WL 462391, at *6 (E.D.N.Y. Feb. 15, 2022).

55:7–10. Second, plaintiff's assertion that he was not required to provide his license and registration because he was not driving is a legal conclusion, and legal conclusions cannot create genuine factual disputes. *See Cotnoir-Debenedetto v. Uniondale Union Free Sch. Dist.*, No. 20-CV-5096 (NGG), 2023 WL 4274701, at *4 (E.D.N.Y. June 29, 2023) ("Legal conclusions, of course, are not statements of fact and cannot dispute an opposing party's statements of fact."). Accordingly, Mr. Caraballo's refusal to produce his license, insurance, and registration upon Detective Surriga's request is an undisputed fact.

There is still, however, an open question as to whether that refusal provides probable cause for his arrest under NYC Traffic Rule § 4-12(a)(3). Although, as I previously discussed, failure to comply with this rule is an arrestable offense, the rule only applies to "[v]ehicle operators." NYC Traffic Rules Title 34, Chap. 4, § 4-12(a)(3), https://www.nyc.gov/html/dot/downloads/pdf/trafrule.pdf. Neither party addresses whether Mr. Caraballo qualifies as a vehicle operator under NYC Traffic Rule § 4-12(a)(3). *See generally* Defs.' Mem.; Pl.'s Opp'n; Defs.' Reply. I have, therefore, decided to conduct my own review of the factual record to determine the undisputed facts related to this question. *See Holtz v. Rockefeller & Co.*, 258 F3d 62, 73 (2d Cir. 2001), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009) ("[W]hile a court is not required to consider what the parties fail to point out in their Local Rule 56.1 statements, it may in its discretion opt to conduct an assiduous review of the record.") (quotations omitted).

It is undisputed that when defendants approached Mr. Caraballo's vehicle, he was sitting in the vehicle's driver's seat. Further, the parties do not dispute that the car belonged to Mr. Caraballo. Pl.'s 56.1 Responses, ¶¶ 1–1a ("On January 23, 2019, . . . plaintiff was sitting in *his* vehicle.") (emphasis added). Finally, I take as undisputed that the vehicle was running when

defendants were in conversation with Mr. Caraballo. *See* Pl. Testimony at 54:20–55:6 (plaintiff testifying that he "believe[d]" his keys were in the ignition when he was sitting in his car, and that he would occasionally turn the car on and off to keep warm"); Detective Surriga Testimony at 67:7–13 (Detective Surriga testifying that while he was in conversation with "the operator of the vehicle"—Mr. Caraballo—the "vehicle engine was on and running"). Although Mr. Caraballo testified at one point that he could not recall whether the vehicle was running when he spoke with defendants, Pl. Testimony at 58:24–59:7, in the face of Detective Surriga's clear testimony, "[p]laintiff's failure to remember cannot create an issue of fact sufficient to withstand summary judgment." *Cheeseboro v. Little Richie Bus Service, Inc.*, 254 F. Supp. 3d 485, 492 (E.D.N.Y. 2017); *see also Khodeir v. Sayyed*, 348 F. Supp. 3d 330, 341 (S.D.N.Y. 2018). As a result, for the purpose of answering the question of whether Mr. Caraballo was a vehicle operator, the undisputed facts are that he was sitting in the driver's seat of his parked vehicle, which was "on and running," Detective Surriga Testimony at 67:13, when the defendants approached it.

"[I]n determining whether conduct gives rise to a state crime (and thus probable cause), federal courts must . . . turn to state law." *Frederick II*, 2021 WL 2645326, at *5. To my knowledge, neither the New York Court of Appeals nor the New York Appellate Division have answered the question of whether someone in Mr. Caraballo's shoes qualifies as a "vehicle operator" under NYC Traffic Rule 4-12(a)(3). When a question is unsettled in state court, a district court must "carefully predict how the state's highest court would resolve the uncertainties," to avoid "distort[ing] established state law." *Runner v. N.Y. Stock Exch.,* 568 F.3d 383, 386 (2d Cir. 2009) (quotations omitted). In making this prediction, courts must "give the fullest weight to pronouncements of the state's highest court . . . while giving proper regard to relevant rulings of the state's lower courts." *Id.* (quotations omitted).

Because no New York court has directly addressed the meaning of the word "operator" as it is used in the statute at issue here, I first look at the text of the rule itself and give the words their ordinary meaning. *See Moskal v. United States*, 498 U.S. 103, 108 (1990) ("In determining the scope of a statute, we look first to its language, giving the words their ordinary meaning." (citations and internal quotation omitted)). Merriam-Webster's dictionary defines an "operator" as "one that operates a machine or device." Meriam-Webster Online, https://www.merriam-webster.com/dictionary/operator (last visited Mar. 26, 2024). And, to "operate" means "to perform a function [or to] exert power or influence." *Id.*, https://www.merriam-webster.com/dictionary/operate (last visited Mar. 26, 2024). Although Mr. Caraballo was not driving his vehicle, because he was sitting in it, *see* Pl. Testimony at 55:1–6, he was performing a function with regard to his vehicle even if that function was not related to the vehicle's primary purpose.

How "operator" is employed elsewhere in the NYC traffic rules also sheds light on the meaning of that term in Rule 4-12(a)(3). Various NYC traffic rules employ "operator" in a way that suggests it applies only to a person currently operating a motor vehicle. *See* NYC Traffic Rule Title 34, Ch. 4, § 4-04(b)(1) (directing that vehicle "operators [are] to yield to pedestrians in [a] crosswalk"); *id.* § 4-12(e) (specifying that no person shall "operate . . . a motor vehicle . . . without having his/her hand on the steering device."). The NYC traffic rules, however, also employ the term "operator" in a manner that suggests the term may apply to an individual who has the potential to operate a vehicle or is sitting in a parked car with the engine turned off. *See id.* § 4-08(a)(9)(v) ("The registrant, title holder or operator of any vehicle that has been *immobilized* shall have the right to an immediate hearing . . . .") (emphasis added); *id.* § 4-08(e)(2) ("[T]he operator of a passenger car may stand the vehicle alongside a fire hydrant provided that the operator remains in

the operator's seat ready for immediate operation of the vehicle at all times and starts the motor of the car on hearing the approach of a fire apparatus."). These two rules suggest that Mr. Caraballo would not necessarily be precluded from classification as a "vehicle operator" simply because he was not driving when defendants approached him. In fact, NYC Traffic Rule 4-08(e)(2) explicitly contemplates that someone facing circumstances similar to Mr. Caraballo's could be a vehicle operator.

Third, several provisions of the New York State Vehicle and Traffic Law ("VTL"), and how New York courts have interpreted them, further support that a vehicle operator could include someone in Mr. Caraballo's shoes. For example, the New York Appellate Division determined that "operate" as used in VTL § 1192(2)—which prohibits operating a motor vehicle while under the influence of alcohol or drugs—captures more conduct than just driving. *See People v. Marriott*, 325 N.Y.S.2d 177, 178 (App. Div. 3d Dep't 1971). The court reasoned that "a person operates a motor vehicle when he begins to use [it] . . . for the purpose of putting [it] . . . in motion even though he does not move it." *Id.*; *see also Prudhomme v. Hults*, 278 N.Y.S.2d 67, 69 (App. Div. 3d Dep't 1967) (determining that an individual was operating a vehicle when he was "slumped over the wheel," while the engine was on, but the car was stopped).

An individual's location within a vehicle, however, is not a necessary precondition to status as an operator. In a more recent case, a New York trial court determined that an officer could conclude that an injured person hiding beneath a damaged vehicle at the scene of an accident, clutching the keys to a different damaged vehicle nearby, had "operated" the nearby vehicle for purposes of VTL § 1192(2), among other provisions. *See People v. Jeffrey*, 998 N.Y.S.2d 307, 2014 WL 4457295, at *4 (Crim. Ct. Sept. 3, 2014). In a case more similar to the instant case, a New York trial court concluded that a person can "operate" a car for purposes of VTL § 401—a

statute requiring production of documentation that is similar to the regulation at issue here—even if they are outside of the vehicle. *See People v. Frank*, 305 N.Y.S.2d 940, 944–45 (Sup. Ct. 1969) ("[T]he intent of the statute is to cover not only the person actually operating the vehicle but also anyone else who exercises dominion over a motor vehicle."). The court in *Frank* reasoned that VTL § 401's purpose is to implement a condition on the privilege of driving on public highways— namely that all vehicles must be registered. *Id.* at 943–44. Accordingly, the court explained that whether an individual is inside or outside a car is not critical to determining whether that individual is an "operator" under this provision; instead, the more important inquiry is whether the individual has "dominion over" the vehicle such that the individual would have access to the registration information. *Id.* at 945. The court concluded that the plaintiff had dominion over the vehicle because he gave the officers permission to search the car, among other reasons. *Id.* For an additional cases interpreting the term operator as used in the New York VTL, see *People v. Ceschini*, 310 N.Y.S.2d 581 (Crim. Ct. 1970) (determining that a person may be operating a vehicle within the meaning of VTL § 600—a statute prohibiting vehicle operators from leaving the scene after they cause damage to property—"while [the vehicle] is at rest or even when the person against whom civil or criminal sanctions are invoked is outside the vehicle," as long as the operator caused the vehicle to damage the property), and *U.S. ex rel. Farrugia v. Bhono*, 256 F. Supp. 391, 393 (S.D.N.Y. 1966) (determining that "[u]nder New York Law, [the o]fficer . . . had a clear right to require defendant to produce his license and registration, even though at the time he was not driving the . . . car [and it was parked]").

Ultimately, these cases suggest that New York courts analyzing traffic statutes define "operator" and "operate" in relationship to the conduct that the statute targets. According to *Frank*, an "operator" under VTL § 401 is an individual with dominion over the vehicle because that

provision concerns vehicle registration; pursuant to *Jeffrey*, an "operator" under VTL § 1192(2) is an individual who has driven, or who is likely to drive, while intoxicated—even if that individual is not actively using the vehicle at the time he is identified—because that provision prohibits operating a vehicle while intoxicated; and according to *Ceschini*, an "operator" under VTL § 600 is an individual who previously caused damage using a vehicle because this provision targets such conduct.

Finally, in a similar case involving an alleged violation of the exact traffic rule at issue here, the United States District Court for the Eastern District of New York considered whether an individual could qualify as a "vehicle operator" when, "at the time [that he] identified himself to [the police officers] . . . as the owner of the vehicle, he was exiting a store, [the] vehicle was parked with the ignition off, and he was several feet away from the vehicle." *Frederick v. Boyd*, Case No. 13-CV-897 (MKB), at 11 (E.D.N.Y. March 22, 2019) ("*Frederick I*"), ECF No. 140. Under these circumstances, the court decided that NYC Traffic Rule 4-12(a)(3) did not apply because the plaintiff was not a vehicle operator, and that, as a result, the plaintiff's refusal to provide his license, registration, and insurance "did not provide probable cause" for his arrest. *Id.* at 16–17. The facts of *Frederick I* are easily distinguishable from the facts of this case—and indeed, the reasoning of *Frederick I* supports concluding that the NYC traffic rule at issue here does cover Mr. Caraballo. Mr. Caraballo was not across the street from his vehicle when the police stopped him; instead, as I previously discussed, he was sitting in his vehicle's driver's seat and the vehicle was running. In fact, much of the evidence the court marshals in *Frederick I* to conclude that the plaintiff is not an operator in that case supports the opposite conclusion in this case. *See, e.g.*, *id.* at 12 (reasoning that the term "operate" in provisions of the VTL—and how New York courts have interpreted that term—suggests that an operator must, "at the very least, [be] . . . physically located

within the vehicle."). Ultimately, on reconsideration and with additional New York case law before it that supported "a broader view of the term 'operators' than the one [the] court initially adopted," the court granted qualified immunity to the defendants. *Frederick II*, 2021 WL 2646326, at *5. It reasoned that "it simply cannot be said that no reasonable officer in [d]efendants' position would have seen probable cause to arrest [the p]laintiff after he refused to produce his identification documents." *Id.* at *6.

In this case, as previously discussed, it is undisputed that the parked vehicle belongs to Mr. Caraballo, that he was sitting in the driver's seat when the officers approached, and that his vehicle was running. These facts demonstrate his dominion over the vehicle. Considering the New York City traffic rules, which indicate that an individual sitting in a parked car can be an operator, and how New York courts have defined individuals facing similar circumstances as operators under provisions of the state VTL, I conclude that the New York Court of Appeals would likely determine that someone in Mr. Caraballo's shoes is a vehicle operator for purposes of NYC Traffic Rule 4-12(a)(3). Accordingly, I also conclude that defendants had at least arguable probable cause to arrest Mr. Caraballo for his refusal to provide identification under this rule. *See Frederick II*, 2021 WL 2646326, at *6 (determining that the defendants were entitled to qualified immunity for concluding that the plaintiff was a vehicle operator and arresting him under NYC Traffic Rule 4-12(e), even though he was standing outside his parked vehicle when he refused to produce the requested documents).

In summary, because defendants had at least arguable probable cause to believe that Mr. Caraballo was the vehicle's operator, they had probable cause to arrest him when he refused to provide Detective Surriga his license, registration, and insurance information. *See id.* at *7. This means that Mr. Caraballo was otherwise lawfully detained when he refused defendants' request to

open his vehicle's door. Because this action constitutes a physical interference with defendants'

attempt to effectuate his lawful arrest, *Lennon*, 66 F.3d at 424, defendants also had at least arguable

probable cause to arrest him for obstructing governmental administration and are therefore entitled

to qualified immunity on his false arrest/false imprisonment claims. Because defendants had at

least arguable probable cause to arrest Mr. Caraballo for obstructing governmental administration,

I decline to analyze whether defendants also had probable cause to arrest Mr. Caraballo for

excessive window tinting and possession of controlled substances.[10] *See Jaegly*, 439 F.3d at 154.

## II.   Malicious Prosecution

I grant defendants' motion for summary judgment as to the portions of plaintiff's malicious

prosecution claim related to the obstruction of governmental administration and possession of

controlled substances charges. I deny defendants' motion for summary judgment as to the portion

of plaintiff's malicious prosecution claim related to the excessively tinted windows charge.

### A.   Law

"To prevail on a § 1983 claim for malicious prosecution, a plaintiff must show a violation

of his rights under the Fourth Amendment[] and must establish the elements of a malicious

prosecution claim under state law." *Azeez v. City of New York*, 790 Fed. App'x 270, 273 (2d Cir.

2019) (quotations omitted). To establish the elements of a malicious prosecution claim under New

York law a plaintiff must demonstrate that: "(1) the defendant initiated a prosecution against

plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding was

begun with malice, and (4) the matter terminated in plaintiff's favor." *Rentas v. Ruffin*, 816 F.3d

214, 220 (2d Cir. 2016) (cleaned up). Further, plaintiff must show that there was "a sufficient post-

---

[10] For an analysis of whether defendants had probable cause to arrest Mr. Caraballo for excessive window tinting see *infra* Discussion II.B.2.

arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000).

To demonstrate that a proceeding was begun with malice, plaintiff must show that the "prosecution complained of was undertaken from improper or wrongful motives, or in reckless disregard of [his rights]." *Manganiello*, 612 F.3d at 163 (quotation omitted). Further, a "lack of probable cause generally creates an inference of malice." *Id.* (quotation omitted).

The probable cause standard relevant to a malicious prosecution claim is different from, but related to, the probable cause standard relevant to a false arrest claim. In a malicious prosecution action, probable cause means "probable cause to believe that [the prosecution] could succeed." *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003). If the "facts and circumstances . . . would lead a reasonably prudent person to believe the plaintiff guilty," then sufficient probable cause exists. *Frost*, 980 F.3d at 243. Whereas courts in the false arrest context are limited to considering only the facts leading up to the arrest in determining whether probable cause exists, *Marcavage v. City of New York*, 689 F.3d 98, 109 (2d Cir. 2012), in a malicious prosecution action, "probable cause is measured as of the time the judicial proceeding is commenced," such as when plaintiff is arraigned, *Majia v. City of New York*, 119 F. Supp. 2d 232, 254 (E.D.N.Y. 2000). The evidence supporting probable cause must be admissible because a prosecution would not likely succeed on the basis of inadmissible evidence. *See Walker v. Carrozzo*, 664 F. Supp. 3d 490, 517 (S.D.N.Y. 2023) ("[I]n instances where evidence 'would clearly not be admissible,' 'there would be no probable cause to believe that the prosecution could succeed.'" (quoting *Boyd*, 336 F.3d at 77.)).

Despite the distinction between probable cause to arrest and probable cause to prosecute, where "probable cause to arrest exist[s] . . . [and there are no] intervening facts between arrest and

20

initiation of prosecution to undermine that probable cause, claims of malicious prosecution cannot survive." *Powell v. Murphy*, 593 Fed. App'x 25, 28 (2d Cir. 2014). In addition to intervening facts or newly discovered evidence, an officer's "failure to make further inquiry when a reasonable person would have done so may be evidence of lack of probable cause." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996). For example, an officer's failure to examine evidence already available to him may lead probable cause that existed at arrest to dissipate prior to the commencement of the prosecution. *See Weiner v. McKeefery*, 90 F. Supp. 3d 17, 34 (E.D.N.Y. 2015).

Like with a false arrest claim, in the malicious prosecution context, a defendant is entitled to qualified immunity if the defendant had "arguable probable cause to charge" the plaintiff. *Richardson v. McMahon*, No. 22-582, 2023 WL 3102910, at *2 (2d Cir. Apr. 27, 2023). The arguable probable cause standard is the same in the malicious prosecution context as it is in the false arrest context. *Id.* at *1.

### B. Application

Defendants argue that Mr. Caraballo's malicious prosecution claims fail because they had at least arguable probable cause to prosecute him for excessively tinted windows, obstruction of governmental administration, and possession of controlled substances. Defs.' Mem. 8–9. Defendants also argue that plaintiff failed to demonstrate that they acted with malice. Unlike the with the false arrest claims, defendants can only defeat the malicious prosecution claims if they "had probable cause"—or, given the qualified immunity context, arguable probable cause—"for each charge for which [p]laintiff was prosecuted." *Rodriguez v. N.Y.C. Police Dep't*, No. 10-CV-891, 2021 WL 5057205, at *5 (S.D.N.Y. Oct. 24, 2011). The only elements of the malicious prosecution claims that defendants discuss are probable cause and malice; I therefore review the

sufficiency of plaintiff's claims as to those two elements only.

1. *Obstruction of governmental administration*

Defendants argue that because there was probable cause to arrest plaintiff and "there is no evidence in the record that probable cause dissipated prior to commencement of the prosecution," I should grant their motion for summary judgment on the malicious prosecution claim related to the obstruction of governmental administration charge. Defs.' Mem. 8. Plaintiff, on the other hand, argues that there was not probable cause to arrest him for the obstruction of governmental administration charge. Pl.'s Opp'n 12. As to malice, plaintiff argues that "malice may be inferred from lack of probable cause." *Id.*

As I previously discussed, there was at least arguable probable cause for defendants to arrest plaintiff for obstruction of governmental administration. Further, as defendants argue, plaintiff points to nothing in the record to demonstrate that probable cause dissipated. *See* Pl.'s Opp'n 12. In fact, plaintiff does not argue that probable cause dissipated; instead, plaintiff asserts that because probable cause did not exist for the arrest, it also did not exist for the prosecution. *Id.* Because I have concluded that probable cause existed at the time of Mr. Caraballo's arrest, and because plaintiff has pointed to no evidence evincing the dissipation of that probable cause, I grant defendants' motion for summary judgment on this portion of the malicious prosecution claim. *See Powell*, 593 Fed. App'x at 28.

2. *Excessively tinted windows*

Defendants provide three reasons why I should grant summary judgment on the malicious prosecution claim related to the allegedly excessively tinted windows: (1) that probable cause existed to arrest plaintiff for this traffic violation; (2) that this probable cause did not dissipate prior to prosecution; and (3) that plaintiff fails to establish that defendants acted with malice. Defs.'

Mem. 8. Mr. Caraballo, on the other hand, argues that probable cause did not exist to arrest him for excessively tinted windows and that, as a result, malice can be implied from the lack of probable cause. Pl.'s Opp'n 12. The facts that defendants argue support their argument that probable cause existed to arrest and prosecute Mr. Caraballo for excessively tinted windows either fail to provide such support or are genuinely disputed.

Defendants primarily argue that they had probable cause to arrest Mr. Caraballo for excessively tinted windows because a tint test indicated that Mr. Caraballo's front windows were tinted with light transmittance of sixty-nine percent, which violates VTL § 375 (12-a).[11] Defs.' Mem. 5. Detective Surriga did not conduct this tint test, however, until after Mr. Caraballo was arrested. *See* Detective Surriga Testimony at 93:9–12; *id.* at 125:20–126:16. In determining whether probable cause existed for this arrest, I am limited to "examin[ing] the events leading up to the arrest" and then deciding whether those "historical facts" amount to probable cause. *Mitchell v. City of New York*, 841 F.3d 72, 77 (2d Cir. 2016) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). Because it is undisputed that the tint meter test reading was not available to defendants when they arrested Mr. Caraballo, I decline to consider it in determining whether probable cause existed to arrest Mr. Caraballo for excessively tinted windows.

Defendants also cite Detective Surriga's deposition testimony to support their position that Mr. Caraballo's windows were excessively tinted. *See* Pl.'s 56.1 Responses ¶ 3 (citing Detective Surriga's deposition transcript at 63:17–24 for the proposition that plaintiff's vehicle had excessively tinted windows). This portion of Detective Surriga's testimony does not support the

---

[11] New York VTL § 375(12-a)(b)(2) prohibits a vehicle's front windows from being treated "with any material which has a light transmittance of less than seventy percent." *Id.* Accordingly, plaintiff's alleged score of sixty-nine percent is one percentage less than the legal limit. Pl.'s 56.1 Responses ¶ 3.

proposition that he believed that Mr. Caraballo's windows were excessively tinted; instead, it supports only the fact that Detective Surriga thought that the windows of the vehicle he was in were *somewhat* tinted. Detective Surriga Testimony at 63:17–24 ("Q. Were there tinted windows in that – on that vehicle that *you were in*? A. Yes.") (emphasis added). Defendants fail to cite any other relevant evidence in the record that supports the position that defendants believed Mr. Caraballo's windows were excessively tinted at the time they arrested him. *See* Pl.'s 56.1 Responses ¶ 3; *see also* Defs.' Mem. 5–6; Defs.' Reply 3–4. In fact, the detectives' deposition testimony indicates only that they thought Mr. Caraballo's windows were tinted, not that they believed the windows were *excessively* tinted.[12] *See* Detective Surriga Testimony at 62:7–8 ("I observed a vehicle parked in front of a fire hydrant with tinted windows"); Lesnevec Decl., Ex. 4 ("Detective Costello Testimony") at 85:12–13 ("The windows [of Mr. Caraballo's vehicle] looked tinted as well."). Further, Detective DiFalco testified that he observed Mr. Caraballo sitting in his vehicle, despite the fact that the window was rolled up, which suggests that the alleged window tint did not obstruct his view. *Id.*, Ex. 5 ("Detective DiFalco Testimony") at 55:15–56:18.

Courts in New York and in this Circuit have found that officers have probable cause to arrest an individual for excessively tinted windows when they reasonably believe that the windows are excessively tinted and provide facts on which that conclusion is based. *See, e.g.*, *People v. Biggs*, 175 N.Y.S. 3d 117, 121 (App. Div. 2d Dep't 2022) (determining that an officer's testimony that "he could not see into the defendant's vehicle" meets the test set by the New York Court of Appeals—"whether the police officer reasonably believes the windows to be over-tinted"—for stopping a motor vehicle for excessively tinted windows); *Djangmah v. Falcione*, No. 08-CV-

---

[12] Under VTL § 375(12-a)(b)(2), as long as a vehicle's front windows have a light transmittance of greater than or equal to 70% the window tints are within the legal limit.

4027, 2013 WL 208914, at *11 (S.D.N.Y. Jan. 18, 2013) (concluding that an officer had probable cause to arrest a driver for excessively tinted windows even though the officer did not conduct a "tint-meter" test because the officer believed that "in his experience, a vehicle is unlikely to be in compliance with the law when the window tint is visible from a distance"), *report and recommendation adopted*, 2013 WL 1195261 (S.D.N.Y. Mar. 25, 2013). Defendants in this case, however, fail to point to any facts in the record to support the proposition that, at the time of Mr. Caraballo's arrest, the defendants believed—much less reasonably so—that Mr. Caraballo's windows were *excessively* tinted. Instead, as I previously discussed, the record evidence supports only that defendants believed Mr. Caraballo's windows were tinted. On these facts, I cannot determine as a matter of law that an objectively reasonable officer would have thought that probable cause existed to arrest Mr. Caraballo for excessively tinted windows. *See People v. Anonymous*, 77 N.Y.S.3d 268, 271 (Crim. Ct. 2018) (determining that an officer's testimony that the defendant's windows "were tinted," with no other supporting evidence, was insufficient to demonstrate that the stop of defendant's car was lawful).

Because I cannot determine as a matter of law that an objectively reasonable officer would have thought probable cause existed to arrest Mr. Caraballo for excessively tinted windows, defendants' argument that they had probable cause to prosecute him for this violation because they had probable cause to arrest is unavailing. Although the tint meter test is not relevant to whether defendants had probable cause to *arrest* Mr. Caraballo, because it was a basis for the charge that he had excessively tinted windows, *see* Accarino Decl., Ex. F, ECF No. 49-6, it is relevant to determining whether they had probable cause to *prosecute* him. *Majia*, 119 F. Supp. 2d at 254 ("[P]robable cause is measured as of the time the judicial proceeding is commenced.").

The tint meter test allegedly yielded an illegal tint reading of sixty-nine percent. Pl.'s 56.1

Responses ¶ 3; *see also* Accarino Decl., Ex. B., ECF No. 49-2 (photograph of tint meter reading); Detective Surriga Testimony at 126:15–25, 128:24–25 (testifying that he took a "tint meter test" of Mr. Caraballo's front windows, which resulted in a score of sixty-nine percent). Plaintiff, however, disputes this reading and instead insists that his windows were not tinted at all. Pl.'s 56.1 Responses ¶ 3a; *see also* Pl.'s Opp'n 10. For support, plaintiff cites a photograph that defendants took in which plaintiff is visible inside his vehicle with the "window all the way up." Pl.'s 56.1 Responses ¶ 3a; *see also* Lesnevec Decl., Ex. 1, ECF No. 52-1. In a deposition, Mr. Caraballo also testified that his front windows were not tinted. Pl. Testimony at 44:12–45:8.

Defendants argue that probable cause existed to prosecute Mr. Caraballo "because there is no evidence in the record to support that the tint meter reading was unreliable." Defs.' Reply 3. They dismiss as "speculative, conclusory, and unsupported" plaintiff's contention that there is no tint on the window. *Id.* Plaintiff's argument that his front windows were not tinted, however, is not unsupported. Instead, plaintiff supports this assertion with photographic evidence that depicts a clear view of plaintiff through his allegedly excessively tinted car window. Pl.'s 56.1 Responses ¶ 3a. His sworn testimony further supports his position. *See* Pl. Testimony at 44:12-45:8. Defendants may not find this evidence persuasive, but I am precluded from "weigh[ing] the evidence"; that function is reserved for the jury. *Rupp*, 91 F.4th at 634. Construing the evidence in the light most favorable to plaintiff as the non-moving party, I find that a reasonable juror could conclude that the photograph of Mr. Caraballo inside his vehicle with the window rolled up, as well as his sworn testimony, refutes the reliability of the tint meter reading. *See SEC v. Sayid*, 860 Fed. Appx. 18, 19 (2d Cir. 2021) ("A genuine dispute requires evidence that would permit a reasonable juror to find for the party opposing the motion.") (cleaned up).

Further, because the tint meter reading is the only evidence in the record that supports

defendants' argument that they had probable cause to prosecute Mr. Caraballo for excessively tinted windows, whether this result is reliable could impact the outcome of the case. If the jury weighs the evidence and finds Mr. Caraballo's evidence more persuasive than the tint meter reading, then no evidence would support defendants' position that probable cause existed to prosecute Mr. Caraballo for excessively tinted windows. Accordingly, because there is a genuine dispute as to the reliability of the tint meter reading and that fact is material, I cannot, as a matter of law, determine that defendants had probable cause to prosecute Mr. Caraballo for this alleged traffic violation. *Cf. Patel v. Inc. Vill. of Old Brookville*, No. 17-CV-2455 (SIL), 2023 WL 2599669, at \*9 (E.D.N.Y. Mar. 22, 2023) (determining that plaintiff created a genuine factual dispute over the positive results of a breathalyzer test by claiming that "he never saw the results, that he had no alcohol that day, and that [the police] report [which included the results] was false" and that, as a result, the court could not determine as a matter of law that probable cause existed to prosecute the plaintiff).

Because the detectives' deposition testimony does not demonstrate as a matter of law that they had probable cause to arrest Mr. Caraballo for excessively tinted windows and because a reasonable juror could find the tint meter reading unpersuasive, it is premature to determine whether defendants are entitled to qualified immunity. Although immunity issues should ordinarily be decided by the court, "that is true only in those cases where the facts concerning the availability of the defense are undisputed." *Oliveira v. Mayer*, 23 F.3d 642, 649 (2d Cir. 1994). Where facts are in dispute that are material to a determination of reasonableness, "summary judgment on qualified immunity grounds is not appropriate." *Husain v. Springer*, 494 F.3d 108, 133 (2d Cir. 2007) (quotations omitted). In this case, as previously discussed, there is a genuine dispute as to the reliability of the tint meter reading, and the reliability of the tint meter reading is material to

determining the reasonableness of defendants' belief that Mr. Caraballo had excessively tinted windows. It is therefore impossible for me to "determine [at this stage] whether. . . [defendants] reasonably believed that their [prosecution was supported by probable cause] . . . [and therefore,] summary judgment on the basis of qualified immunity [is] precluded." *Thomas v. Roach*, 165 F.3d 137, 144 (2d Cir. 1999); *see also Graham v. City of New York*, 928 F. Supp. 2d 610, 624 (E.D.N.Y. 2013) (denying summary judgment on qualified immunity as premature because there were disputed factual issues concerning whether the plaintiff engaged in unlawful conduct justifying his arrest).

Finally, defendants also argue that Mr. Caraballo cannot demonstrate that they acted with malice "because there is no evidence in the record to even remotely suggest that the defendants had a wrong or improper motive." Defs.' Mem. 8 (quotation omitted). As plaintiff argues, however, "lack of probable cause generally raises an inference of malice sufficient to withstand summary judgment." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 131 (2d Cir. 1997). In this case, as I previously discussed, "a jury could find that probable cause for the charge[] against . . . [Mr. Caraballo was lacking], and that finding alone . . . support[s] an inference of malice." *Id.* Accordingly, I decline to grant defendants' motion for summary judgment on this claim.

### 3. *Possession of controlled substances*

Defendants argue that I should grant summary judgment on the malicious prosecution claim related to their prosecution of Mr. Caraballo for alleged possession of controlled substances because they had probable cause to arrest him for this offense and the probable cause did not dissipate prior to the commencement of the prosecution. Defs.' Mem. 7–8. Defendants assert two bases for probable cause: (1) that defendants thought, based on their training and experience, that the rocks Detective Surriga recovered from Mr. Caraballo's vehicle—which were "accompanied

with drug paraphernalia," including the rubber bands, blade, and "vacuum sealed bag"—were crack cocaine; and (2) that Detective Surriga "field tested the rocks appearing to be crack cocaine, and the rocks tested positive for cocaine." *Id.* at 7; Defs.' Reply 4–5.

Before I turn to whether defendants had at least arguable probable cause to prosecute Mr. Caraballo for possession of controlled substances, I must first decide whether plaintiff's responses to defendants' statement of facts related to this charge create genuine disputes. The record supports defendants' assertion that Detective Surriga recovered the rocks, blade, rubber bands, and Ziploc bag from Mr. Caraballo's vehicle. *See* Accarino Decl., Ex. D, ECF. No. 49-4 (NYPD Property Clerk Invoice recording the materials recovered from Mr. Caraballo's vehicle). Mr. Caraballo disputes, however, defendants' assertion that Detective Surriga recovered these materials from his vehicle. Pl.'s 56.1 Responses ¶¶ 11–11a. Mr. Caraballo's dispute is based on the fact that although Detective Surriga does not recall whether he photographed the materials that he recovered from Mr. Caraballo's vehicle, he does recall photographing Mr. Caraballo and the vehicle itself. *See id.* ¶ 11a; *see also* Detective Surriga Testimony at 96:14–22, 115:6–15. Although plaintiff does not explain how this evidence is relevant to disputing that Detective Surriga collected these materials, Pl.'s Opp'n 11–12, the logic of the attempted dispute seems to be that had Detective Surriga recovered these materials, he would have recalled photographing them. That Detective Surriga does not recall whether he took photographs of the materials, however, does not contradict the factual assertion that he recovered these materials from plaintiff's vehicle. Accordingly, I deem as admitted the fact that Detective Surriga recovered from Mr. Caraballo's vehicle substance he thought was crack cocaine, a blade, rubber bands, and a Ziploc bag. *See Lebada v. N.Y.C. Dep't of Educ.,* No. 14-CV-758, 2016 WL 626059, at *11 (S.D.N.Y. Feb. 8, 2016) (deeming as admitted defendants' Rule 56.1 statements that plaintiff attempted to dispute with citations to the record that

did not specifically contradict the 56.1 statements). I decline to determine whether the remaining fact related to the controlled substances possession charge—whether Detective Surriga fabricated the field test—is genuinely disputed. As I explain in more detail below, at least arguable probable cause exists on the basis of defendants' observations, training, and experience, and so any probable cause on the basis of the alleged field test is immaterial.

Plaintiff argues that probable cause did not exist to arrest or prosecute Mr. Caraballo for possession of controlled substances because Detective Surriga did not discover the materials that he thought were controlled substances until after Mr. Caraballo was arrested. Pl.'s Opp'n 11–12. This argument is unavailing because probable cause for a malicious prosecution claim is measured from the commencement of the judicial proceeding, not arrest. *Majia*, 119 F. Supp. 2d at 254. Detective Surriga's recovery of these materials is in the charging document, and I can consider this fact in determining whether probable cause existed to prosecute Mr. Caraballo for possession of controlled substances. Accarino Decl., Ex. F.

Plaintiff does not respond to defendants' argument that they had at least arguable probable cause to prosecute Mr. Caraballo because the rock substances appeared to defendants to be crack cocaine based on their "training and experience, as well as the fact that they were accompanied with drug paraphernalia." Defs.' Mem. 7; Pl.'s Opp'n 11–13; *see also* Accarino Decl., Ex. F ("Deponent further states that his conclusion that the substance recovered is cocaine is based upon his experience as a police officer and in his training in the identification and packaging of controlled substances and marijuana."). Facts that support probable cause often "arise from an officer's observations, including his or her use of experience or training to draw reasonable inferences." *United States v. Green*, No. 18-CR-121, 2020 WL 9459171, at *6 (W.D.N.Y. Apr. 13, 2020). Even though defendants' belief that the rock substance was crack cocaine was ultimately

incorrect, *see* Pl.'s Opp'n 7; Defs.' Mem. 7, their belief was informed by their "training and experience" and by the fact that the rock substance was located near what they also believed to be drug paraphernalia. *See* Detective Surriga Testimony at 115:16–116:6; *see also* Accarino Decl., Ex. F.

In the context of false arrest, facts like these can support a finding of probable cause. *See, e.g.*, *United States v. Bignon*, 813 Fed. App'x 34, 36–37 (2d Cir. 2020) (determining that, in "giving 'due weight'" to the officer's "extensive history enforcing New York's marijuana laws," a "reasonably prudent person could believe" that the defendant was smoking marijuana based on the totality of the circumstances, even though a lab test later revealed it was not marijuana); *Clark v. Sikorski*, 16-CV-7744, 2020 WL 469427, at *5 (S.D.N.Y. Jan. 29, 2020) (deciding that an officer had "probable cause to arrest" the plaintiff for possession of "what appeared to be cocaine" because the officer thought that the substance was cocaine "based on his training and experience," even though "laboratory results ultimately showed that the substance . . . was not [cocaine]"); *United States v. Harris*, No. 09-CR-0028, 2009 WL 3055331, at *6 (N.D. Ill. Sept. 21, 2009) ("First, it matters not that the subsequent laboratory testing revealed the white substance in the plastic bag . . . was a bar of soap. The agents were mistaken, but based on their training and experience, they believed that the substance resembled pressed cocaine . . . . and such belief would certainly have supported a finding [of] probable cause."). Defendants' belief, based on their training experience, that the rock substance was crack cocaine and that the other materials were paraphernalia, also supports a finding of probable cause to prosecute. Plaintiff does not argue that this probable cause dissipated before the lab test demonstrated that the rock substance was not crack cocaine, at which point defendants dropped the controlled substances possession charge. *See* Pl.'s Opp'n 7, 11–12. In fact, plaintiff's arguments about probable cause relate only to his arrest

31

and the timing of the field test. *Id.* at 11–12. Plaintiff also does not argue that any of the evidence supporting probable cause would be inadmissible, and therefore unable to support a prosecution. *See Walker*, 664 F. Supp. 3d at 517.

In his discussion of malice, plaintiff raises an argument that sounds in a *Lowth* theory of probable cause dissipation. 82 F.3d at 571 ("[An officer's] failure to make further inquiry when a reasonable person would have done so may be evidence of lack of probable cause."). Without citing any law, plaintiff contends that malice can be inferred from the fact that "[d]efendants failed to obtain subsequent tests of any substances in [p]laintiff's case at any qualified laboratory for nearly two full years." *Id.* at 12–13. Even if I were to read this argument about malice as one about probable cause, plaintiff's assertion is both factually inaccurate and fails to support his position that probable cause did not exist to prosecute Mr. Caraballo for possession of controlled substances. First, the record supports, and plaintiff admits, that defendants dropped the possession of controlled substances charge approximately three and a half months after his arraignment—not, as he argues in his opposition motion, two years later. *See* Pl.'s 56.1 Responses ¶¶ 14–15a; Accarino Decl., Ex. G ("Certificate of Disposition"), ECF. No. 49-7. Second, plaintiff does not point to any facts in the record, or even suggest, that three and a half months lasped between arraignment and the dismissal of the charges because of defendants' failure to investigate. *See* Pl.'s Mem. 12–13. As a result, plaintiff fails to meet his burden of "coming forward with specific facts showing that there is a genuine issue for trial." *See Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (cleaned up).

Accordingly, defendants had at least arguable probable cause to prosecute Mr. Caraballo for his suspected controlled substances possession, and I grant defendants' motion for summary judgment on this portion of the malicious prosecution claim. Because at least arguable probable

cause exists on the basis of defendants' observations, training, and experience, I do not need to address plaintiff's and defendants' probable cause arguments related to the alleged field test.

## III.   Malicious Abuse of Process

Defendants also move for summary judgment on plaintiff's § 1983 malicious abuse of process claim. For the reasons set for below, I grant defendants' motion for summary judgment on this claim.

### A.  Law

As with false arrest and malicious prosecution, to prevail on a federal § 1983 claim of malicious abuse of process, a plaintiff must establish the elements for this claim under state law, which includes showing that a defendant: "(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003) (quotation omitted). Additionally, a plaintiff bringing a malicious abuse of process claim under §1983 must show that the defendant deprived him of a constitutional right. *Peter L. Hoffman & Lotte, LLC v. Town of Southampton*, 893 F. Supp. 2d 438, 446 (E.D.N.Y. 2012). Under the third element of this claim, a plaintiff must establish that the defendant had more than an improper motive; the defendant must have used the process for an "improper purpose." *Savino*, 331 F.3d at 77. It is not "sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution. Instead, he must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Id.*; *see also TADCO Constr. Corp. v. Dormitory Auth. of N.Y.*, 700 F. Supp. 2d 253, 272 (E.D.N.Y. 2010) (determining that the plaintiffs adequately alleged a collateral purpose by pleading that defendants "arrested and charged [them] with

33

trespassing . . . [to] obtain an advantage over them in the ongoing contractual and construction disputes" (quotation omitted)). Examples of a collateral objective include "the infliction of economic harm, extortion, blackmail, and retribution." *Jain v. City of New York*, No. 20-CV-5442, 2021 WL 6064204, at *4 (S.D.N.Y. Dec. 22, 2021) (quotation omitted).

### B. Application

Defendants primarily argue that I should grant summary judgment on plaintiff's malicious abuse of process claim because plaintiff fails to establish that defendants had a collateral purpose beyond Mr. Caraballo's criminal prosecution. Defs.' Mem. 9. Without citing to any evidence in the record or any legal authority, plaintiff asserts that defendants "unlawfully arrested and prosecuted [p]laintiff for two years with the sole intent to harm him, which is an illegitimate collateral objective." Pl.'s Opp'n 13. Plaintiff further contends that defendants falsely arrested and prosecuted Mr. Caraballo because they were "frustrated with [his] lawful request for a supervisor." *Id.* Plaintiff again fails to cite to record evidence to support this assertion. Even if plaintiff is correct that defendants arrested and prosecuted him due to his request for a supervisor, this is not a sufficient collateral objective because it is not "beyond or in addition to his criminal prosecution." *Savino*, 331 F.3d at 68, 77 (granting summary judgment on plaintiff's malicious abuse of process claim for lack of collateral purpose where plaintiff alleged that defendants prosecuted him for stealing a ring as "retaliation for the embarrassing media attention stemming from his allegedly exorbitant overtime pay").

Although plaintiff does not explicitly make this argument, his opposition could be read to assert that I should imply a collateral purpose from the lack of probable cause to arrest and prosecute him. If plaintiff intends to make this argument, it is only relevant to the excessively tinted windows charge, and as to that charge, it is unavailing. Courts in this circuit have determined

that "even where probable cause does not support a plaintiff's prosecution, the failure to plead a collateral objective is fatal to an abuse of prosecution claim." *Isaac v. City of New York*, No. 16-CV-4729 (KAM) (RLM), 2018 WL 5020173, at *9 n.15 (E.D.N.Y. Aug. 6, 2018), *report and recommendation adopted*, 2018 WL 4583481 (E.D.N.Y. Sept. 24, 2018); *see also Ortiz v. Wagstaff*, 2019 WL 1236336, at *4 (W.D.N.Y. Mar. 18, 2019) (same); *Folk v. City of New* York, 243 F. Supp. 3d 363, 372, 375 (E.D.N.Y. 2017) (dismissing plaintiff's abuse of process claim, despite plaintiff's plausible claim of lack of probable cause); *Burbar v. Vill. of Garden City*, 961 F. Supp. 2d 462, 473–74 (E.D.N.Y. 2013) (same). Because plaintiff fails to establish a collateral purpose, I grant defendants' motion for summary judgment as to plaintiff's malicious abuse of process claim.

## IV. Denial of the Right to a Fair Trial

For the reasons set forth below, I grant defendants' motion for summary judgment on plaintiff's denial of the right to a fair trial claim.

### A. Law

To prevail on a § 1983 claim for denial of a fair trial based on allegedly fabricated evidence a plaintiff must establish that: "(1) [an] investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) . . . [he] suffers a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016). It does not matter whether plaintiff's case makes it to trial; this claim "may be sustained where charges are dismissed before trial." *Rodriguez v. City of New York*, 291 F. Supp. 3d 396, 415 (S.D.N.Y. 2018).

Probable cause for an arrest or prosecution is not a complete defense to a denial of a fair trial claim. Even if probable cause exists to arrest and prosecute a plaintiff on charges unrelated to

the fabricated evidence, a fair trial claim may move forward "if the fabricated evidence [proximately] causes some further deprivation." *Ganek v. Leibowitz*, 874 F.3d 73, 91 (2d Cir. 2017) (quotation omitted); *see also Hoyos v. City of New York*, 650 Fed. App'x 801, 803 (2d Cir. 2016).

**B. Application**

The parties dispute whether Detective Surriga field tested the rock substance: Defendants allege that he did and that the test yielded a positive result, whereas plaintiff contends that Detective Surriga fabricated the field test. *See* Pl.'s 56.1 Responses ¶¶ 12–12a; *see also* Pl.'s Opp'n 15–16. Even if plaintiff is correct that Detective Surriga fabricated the field test, defendants argue that plaintiff "cannot demonstrate that he suffered an independent deprivation of liberty as a result of [the allegedly fabricated field test]." Defs.' Mem. 11–12. The only deprivations of liberty that plaintiff suffered after his arraignment were criminal court appearances. *Id.*; *see also* Pl.'s Opp'n 15–16 (articulating no additional deprivations). Defendants argue that these deprivations can be attributed to the other charges which were supported by evidence that plaintiff does not contend was fabricated. Defs.' Mem. 12. For support, they point to the fact that they dismissed the possession of a controlled substance charge on May 3, 2019, but did not dismiss the other charges until December 8, 2020. *Id.*; *see also* Pl.'s 56.1 Responses ¶ 13–15a. Defendants argue that the fact that they continued to prosecute Mr. Caraballo even after they dismissed the possession charge demonstrates that the possession charge was not a necessary precondition for the criminal case and the resulting liberty deprivations. Defs.' Mem. 12. In other words, they contend that these deprivations would have occurred even without the possession charge.

Although plaintiff accurately states that "falsified evidence establishing a [fair trial] claim 'need not be the sole or continuous reason the plaintiff was deprived of liberty,'" Pl.'s Opp'n at 15

(quoting *Thompson v. Clark*, No. 14-CV-7349 (JBW), 2018 WL 3128975, at *5 (E.D.N.Y. June 26, 2018)), he does not produce any evidence to contradict defendants' argument that the allegedly fabricated field test did not cause a liberty deprivation, *see id.* at 14–16. If the non-moving party on a summary judgment motion would bear the burden of proof at trial, as Mr. Caraballo would, that party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). Mr. Caraballo has failed to put forward any evidence "to demonstrate the existence of a genuine dispute of material fact as to whether the allegedly fabricated evidence caused a further liberty deprivation." *Collins v. City of New York*, No. 14-CV-08815, 2019 WL 1413999, at *3 (S.D.N.Y. Mar. 29, 2019). Accordingly, I grant defendants' motion for summary judgment on the denial of the right to a fair trial claim. *See Caravalho v. City of New York*, 732 Fed. App'x 18, 24 (2d Cir. 2018) (affirming the district court's grant of summary judgment on plaintiffs' fair trial claim because plaintiffs "failed to adduce any evidence demonstrating that they were detained as a result of the allegedly fabricated [evidence] . . . rather than their arrest for [a charge unrelated to that allegedly fabricated evidence]").

## V.    Excessive Use of Force

For the reasons set forth below, I deny in part and grant in part defendants' motion for summary judgment on plaintiff's excessive use of force claim.

### A.  Law

The Fourth Amendment prohibits a police officer from using "unreasonable and therefore excessive force" during an arrest. *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010). This reasonableness standard is "objective." *Graham v. Connor*, 490 U.S. 386, 288 (1989). Whether an officer uses reasonable force is a fact specific inquiry, which requires "a balancing of various

factors." *Graham v. City of New York*, 928 F. Supp. 2d at 617. Courts must consider: "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Tracy*, 623 F.3d at 96 (citing *Connor*, 490 U.S. at 396, and *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006)). Further, "[e]xcessive force claims require serious or harmful, not de minimis use of force." *Gutierrez v. City of New York*, No. 13-CV-3502, 2015 WL 5559498, at *7 (S.D.N.Y. Sept. 21, 2015). Although "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment," *Connor*, 490 U.S. at 397, if an officer's show of force is grossly disproportionate to the risk of harm under the *Connor* factors, it may support a claim for excessive force, *Rech v. City of Batavia*, No. 15-CV-6732, 2020 WL 529280, at *8 (W.D.N.Y. Feb. 3, 2020).

The defense of qualified immunity "is generally available against excessive force claims." *Finnegan v. Fountain*, 915 F.2d 817, 822–23 (2d Cir. 1990). When a defendant invokes this defense against an excessive use of force claim, the question is "whether a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances." *Lennon v. Miller*, 66 F.3d 416, 425 (2d Cir. 1995) (quotation omitted).

## B. Application

Defendants move for summary judgment as to two portions of plaintiff's excessive use of force claims: (1) that Detective Surriga used excessive force when he shattered Mr. Caraballo's vehicle window; and (2) that Detectives Costello and DiFalco used excessive force in removing Mr. Caraballo from his vehicle. *See* Defs.' Mem. 13–15. Defendants do not argue that they are entitled to qualified immunity on the excessive force claim related to the shattered window, but they do assert qualified immunity on the excessive force claim related to defendants' extraction of

Mr. Caraballo from his vehicle. Defs.' Mem. 17, 19. I grant defendants' motion for summary judgment as to the first portion of plaintiff's excessive use of force claim but deny summary judgment as to the second portion of this claim.[13]

It is undisputed that Detective Surriga shattered the front passenger-side window of Mr. Caraballo's vehicle after Mr. Caraballo refused to open his vehicle's door. Pl.'s 56.1 Responses ¶¶ 8–8a; Pl. Testimony at 57: 13–14; Detective Surriga Testimony at 72:21–73:10. When Detective Surriga shattered the window, plaintiff alleges glass went "everywhere," including on him; plaintiff does not indicate, however, whether the glass caused him any specific injury. Pl. Testimony at 57: 67:17–22. As I previously discussed, when Detective Surriga broke Mr. Caraballo's window, defendants had probable cause to arrest him both for his failure to produce his license, registration, and insurance information and for obstruction of governmental administration. Although these alleged offenses are not serious, and defendants have not alleged

---

[13] It is not clear whether plaintiff asserts a third variation on his excessive force claim. In his response to defendants' 56.1 statement of facts, plaintiff cites Detective Surriga's deposition testimony to assert that Detective Surriga "assisted in the physical arrest of [p]laintiff by holding his legs down." Pl.'s 56.1 Responses ¶ 10a. Although it is unclear whether plaintiff argues that this action constitutes excessive force, Detective Surriga's deposition testimony does not support that he "held" plaintiff's legs down; instead, the portion of the testimony plaintiff cites indicates that Detective Surriga simply "placed" his hands on Mr. Caraballo's legs, at which point his "legs basically stopped moving." Detective Surriga Testimony at 85:18–86:15. In his opposition papers, without citing any evidence in the record, plaintiff asserts that "[d]efendant DiFalco [not Detective Surriga . . . . held] [p]laintiff's legs down as his fellow [d]efendants beat [p]laintiff with batons." Pl.'s Opp'n 18. Further, plaintiff fails to cite to any law to support that this action constitutes excessive force. If an officer could be held liable for excessive use of force for simply placing his hands on an individual, which is all that has been alleged here, it is difficult to imagine how any arrest could be lawful. *See Connor*, 490 U.S. at 396 ("Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion . . . to effect it."); *Mendoza v. Mclean*, 14-CV03231, 2016 WL 3542465, at *5 (S.D.N.Y. June 23, 2016) ("When there is probable cause to arrest, and the injury resulting from alleged excessive force is de minimis, the excessive force claim is typically dismissed."). Accordingly, assuming that Mr. Caraballo intends to bring an excessive use of force claim against Detective Surriga for placing his hands on Mr. Caraballo's legs during his arrest, I grant defendants' motion for summary judgment as to that action.

that Mr. Caraballo posed an immediate threat to the officers or to others, he was actively resisting arrest by not opening his vehicle's door upon defendants' requests. Because Mr. Caraballo was actively resisting lawful arrest by refusing to open his door, Detective Surriga's conduct breaking the window to unlock the vehicle in attempt to effectuate the arrest was not objectively unreasonable, especially considering that plaintiff did not allege any injuries resulting from this act alone. *See Gutierrez v. City of New York*, No. 13-CV-3502, 2015 WL 5559498, at *2, *7–8 (S.D.N.Y. Sept. 21, 2015) (determining that officers, who suspected the plaintiff of committing two traffic violations, did not use excessive force when they broke the plaintiff's vehicle window and sprayed pepper spray inside the vehicle after the plaintiff refused to exit the vehicle, in defiance of their orders); *McKenzie*, 2019 WL 3288267, at * 10 (explaining that the plaintiff did not allege "any injury that occurred as a result of his removal from the car" and that that was partially why it decided to dismiss this claim); *see also Guerrero v. Dillard*, 17-CV-925, 2019 1299605, at *6 (W.D. Tex. Mar. 21, 2019) ("[B]ecause of her ongoing attempts to free her vehicle and refusal to get out of the vehicle when ordered, the deputies' decision to break the car window and forcibly remove her was sensible, not excessive or unreasonable.").

Defendants next argue that they are entitled to summary judgment on the portion of plaintiff's excessive use of force claim related to his forcible removal from his vehicle. Defendants argue that as a matter of law they did not use excessive force in removing Mr. Caraballo from his vehicle and that, even if they did, the detectives are entitled to qualified immunity because they were objectively reasonable in their belief that the force they used to remove plaintiff from his car was not excessive. Defs.' Mem 14–15, 19. I will first discuss defendants' argument that they did not use excessive force as a matter of law and then turn to their qualified immunity argument.

The facts related to this claim are genuinely disputed. Defendants argue that Detectives

DiFalco and Costello removed Mr. Caraballo through the open driver's door. *See* Pl.'s 56.1 Responses ¶ 9; *see also* Pl. Testimony at 68:6–70:22 (plaintiff testifying that he was extracted through the vehicle's door "violently," that defendants' beat him with clubs as they were pulling him out of the vehicle, and that he was thrown on the ground). Plaintiff, on the other hand, argues that defendants extracted him through the open driver's window, not through the open door. *See* Pl.'s 56.1 Responses ¶ 9a; *see also* Detective DiFalco Testimony at 64:14–19, 66:4–72:4 (Detective DiFalco describing in detail the process of extracting plaintiff through his vehicle's open window).[14] Plaintiff further disputes whether he resisted opening his door after Detective Surriga shattered the passenger-side window and unlocked the doors. According to Mr. Caraballo, after Detective Surriga unlocked the doors, he did not try to keep the door closed. Pl. Testimony at 68:10–24. Detective DiFalco, on the other hand, testified that after Detective Surriga shattered the passenger-side window and unlocked the doors, Mr. Caraballo held the driver's side door shut, preventing Detective Costello from fully opening it. Detective DiFalco Testimony at 61:21–64:19. The conflicting testimony concerning the manner of Mr. Caraballo's extraction from the vehicle, the degree of force used during his extraction, and whether he held the door shut after Detective Surriga unlocked the vehicle creates a genuine dispute.

These disputed facts are also material to the success of plaintiff's claims. "The Second

---

[14] In their 56.1 Statement, defendants assert that they extracted Mr. Caraballo from his vehicle through the vehicle's door, and plaintiff asserts that defendants extracted him through the vehicle's window. Pl.'s 56.1 Responses ¶¶ 9–9a. The parties' positions in their respective deposition testimonies, however, are reversed. In his deposition testimony, plaintiff testified that defendants removed him through his vehicle's door, *see* Pl. Testimony at 68:6–70:22, and defendant Detective DiFalco testified that he removed plaintiff through the vehicle's window, *id.*, Detective DiFalco Testimony at 64:14–19, 66:4–72:4. Regardless of whether defendants removed Mr. Caraballo from his vehicle through the open window or the open door, his assertions regarding the violent nature of his removal and that he did not hold his vehicle door shut are sufficient to create a genuine dispute.

Circuit has concluded that forcibly removing a non-violent arrestee from his or her car can be the basis of an excessive force claim." *Graham*, 928 F. Supp. 2d at 618–19 (citing *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123–24 (2d Cir. 2004)). In *Robinson v. Via*, 821 F.2d 913 (2d Cir. 1987), for example, the Second Circuit determined that the plaintiff's assertions that the defendant "pushed her against the inside of the door of her car, yanked her out, threw her up against the fender, and twisted her arm behind her back" were sufficient to "prevent summary dismissal of a § 1983 claim for excessive force." *Id.* at 923–24. Similarly, in *Graham*, the district court determined that a reasonable jury could find that the defendant used excessive force against the plaintiff who was pulled over for suspected traffic violations, was not an immediate threat, and was not actively resisting arrest, when he forcibly dragged the plaintiff "from his vehicle, shoved him against it, and handcuffed him behind his back." 928 F. Supp. 2d at 618–19. Mr. Caraballo's description of his removal from his vehicle is similar to the assertions made by the plaintiffs in *Robinson* and *Graham*. He contends that defendants "violently" extracted him from his vehicle while beating him with clubs, threw him on the ground, and that he was not actively resisting arrest. Pl. Testimony at 68:6–70:22. Viewing the facts in the light most favorable to Mr. Caraballo, I find that a reasonable jury could determine that defendants used excessive force against Mr. Caraballo when removing him from his vehicle.

The defendants also argue that they are entitled to qualified immunity on "plaintiff's excessive force claim regarding his removal from the vehicle." Defs. Mem. 25. When it is undisputed that a plaintiff is actively resisting arrest or refusing an officer's orders, it may be objectively reasonable for an officer to believe that forcibly removing a plaintiff from a vehicle does not constitute excessive use of force; in such a circumstance, that officer may be entitled to qualified immunity. *See Lennon*, 66 F.3d at 426 (determining that the defendants were not

objectively unreasonable in their belief that their actions did not constitute excessive force when they "pulled [the plaintiff's] hand off the ignition," "yanked" her out of the car, and it was undisputed that "she would not leave the car on her own"); *McKenzie*, 2019 WL 3288267, at *10 ("On the undisputed facts, which include that [the plaintiff] . . . refused to exit the car, the officer's forcible removal and their ensuing (and non-injury-causing) restraint of him cannot be held objectively unreasonable.").

*Lennon* and *McKenzie* are not, however, persuasive here. As I previously discussed, whether Mr. Caraballo was actively resisting arrest when defendants forcibly extracted him from his vehicle is a disputed fact. The degree of force defendants used to extract Mr. Caraballo from his vehicle is also in dispute. In fact, the force that plaintiff contends defendants used to extract him from his vehicle is much more severe than the force that defendants in *Lennon* and *McKenzie* employed. *Lennon*, 66 F.3d at 426 (describing the force that the defendants employed against the plaintiff to remove her from her vehicle as "not even a push or a shove"); *McKenzie*, 2019 WL 3288267, at *10 (explaining that, "[a]lthough a plaintiff is not required to demonstrate that he received medical attention to make" an excessive use of force claim, it was "notable" that the plaintiff did "not attest to *any* injury that occurred as a result of his removal from the car"). When material facts are in dispute, as they are here, it is premature to grant qualified immunity on an excessive force claim. *See Mickle v. Morin*, 297 F.3d 114, 122 (2d Cir. 2002) ("Where the circumstances are in dispute, and contrasting accounts present factual issues as to the degree of force actually employed and its reasonableness, a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity." (quotations omitted and cleaned up)); *Graham*, 928 F. Supp. 2d at 624 (denying qualified immunity because "[t]here are factual issues concerning whether Plaintiff engaged in obstruction of governmental administration and violated the New

York Vehicle and Traffic Law, justifying his arrest and the use of force."); *Milfort v. Prevete*, 922 F. Supp. 2d 398, 408–09 (E.D.N.Y. 2013) (denying qualified immunity because "[t]here is a genuine dispute as to what degree of force" defendants used against plaintiff and because "[i]f a jury were to . . . find that [p]laintiff was calm and cooperative during the incident" then it would have been "objectively unreasonable" for defendants to use that force)  Without knowing whether Mr. Caraballo was actively resisting arrest when defendants extracted him from the vehicle and how defendants extracted him from the vehicle, I cannot determine "whether the officers reasonably believed that their force was not excessive." *Curry v. City of Syracuse*, 316 F.3d 324, 334 (2d Cir. 2003). Accordingly, because there is a genuine dispute as to material facts related to Detectives DiFalco and Costello's extraction of Mr. Caraballo from his vehicle, I deny defendants' motion for summary judgment and conclude that at this time, they cannot invoke qualified immunity.

## VI.   Failure to Intervene

Defendants move for summary judgment on the failure to intervene claims that plaintiff brings against: (1) Detectives DiFalco and Costello; and (2) Detective Surriga for his failure to prevent the other detectives from removing plaintiff from his vehicle. For the reasons set forth below, I grant defendants' motion for summary judgment on the claims against Detectives DiFalco and Costello, but I deny summary judgment on the claim against Detective Surriga.

### A.  Law

When excessive force is being used by another officer, a law enforcement official can be held liable for failing to intervene under §1983 when: "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take

reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008). Further, "where the officer is a direct participant in the allegedly unlawful conduct, the failure to intervene theory of liability is inapplicable." *Bird v. Cnty. of Westchester*, 20-CV-10076, 2022 WL 2263796, at *10 (S.D.N.Y. June 23, 2022).

### B. Application

As to the claims against Detectives Costello and DiFalco, defendants argue that I should grant summary judgment because "plaintiff alleges [their] direct involvement." Defs.' Mem. 16. In his opposition, plaintiff neither addresses this argument specifically, nor presents any reason why I should not grant summary judgment on the failure to intervene claims against Detectives Costello and DiFalco. Pl.'s 18–19. Accordingly, I deem these claims abandoned and grant defendants' motion for summary judgment. *See Jackson v. Fed. Exp.*, 766 F.3d 189, 195 (2d Cir. 2014) ("[A] partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims.").

As to the claim against Detective Surriga related to his failure to intervene when the other detectives forcibly removed Mr. Caraballo from his vehicle, defendants argue that I should grant summary judgment because plaintiff "cannot prove any underlying constitutional violation." Defs.' Mem. 16. I denied summary judgment, however, on the excessive force claim against Detectives DiFalco and Costello for forcibly removing Mr. Caraballo from his vehicle. Accordingly, this argument is unavailing. Defendants do not raise any other arguments in favor of granting summary judgment on this claim. Defs.' Mem. 15–16. Defendants also do not argue that Detective Surriga is entitled to qualified immunity on this claim. *Id.* at 17–19. In their reply, defendants note that "plaintiff points to no evidence in the record to demonstrate that defendant Surriga had a reasonable opportunity to intervene." Defs.' Reply 9–10. Because this argument was

raised for the first time in defendants' reply, however, I decline to consider it. *See Am. Hotel Int'l Grp. Inc. v. OneBeacon Ins. Co.*, 611 F. Supp. 2d 373, 375 (S.D.N.Y. 2009) ("[A] district court is free to disregard argument raised for the first time in reply papers, especially on a motion for summary judgment."). Accordingly, I deny defendants' request for summary judgment on this claim.

## VII.    New York City as a Defendant

Defendants assert that, although New York City is a named defendant, I should dismiss it from the case because plaintiff asserts no claims against it. Defs.' Mem. 2. Plaintiff does not respond to this argument. *See generally* Pl.'s Opp'n. As a result, I deem as abandoned any potential claims against New York City and dismiss it from this case. *See Jackson* 766 F.3d at 195.

**CONCLUSION**

For the foregoing reasons, it is hereby ordered that:

New York City is dismissed as a party from this case;

Summary judgment is denied as to plaintiff's § 1983 malicious prosecution claim related to defendants' prosecution of plaintiff for allegedly excessively tinted windows;

Summary judgment is denied as to plaintiff's § 1983 excessive use of force claim against Detectives DiFalco and Costello related to their forcible extraction of Mr. Caraballo from his vehicle;

Summary judgment is denied as to plaintiff's § 1983 failure to intervene claim against Detective Surriga for failing to stop the other detectives from forcibly removing Mr. Caraballo from his vehicle;

Summary judgment is granted on all other claims, excluding those on which defendants did not move for summary judgment, which include: (1) the excessive use of force claims against

Detectives DiFalco and Costello for allegedly battering Mr. Caraballo; and (2) the failure to intervene claim against Detective Surriga for failing to prevent the other detectives from allegedly battering Mr. Caraballo.


SO ORDERED.


                                                         /s/
                                               Allyne R. Ross
                                               United States District Judge

Dated:          March 28, 2024
                     Brooklyn, New York